IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TARA LEE GILLIM, | ) |
|       Plaintiff, | ) ) )   Case No. 11 C 7146 |
| v. | ) )   Magistrate Judge Daniel G. Martin |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) ) ) |
|       Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Tara Lee Gillim (Gillim) seeks judicial review of the final decision of the Commissioner of Social Security denying her application for disability insurance benefits (DIB). The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and filed cross-motions for summary judgment. Because the administrative law judge's decision is not supported by substantial evidence, the denial of benefits is reversed and this case is remanded for further proceedings consistent with this opinion.

**I.  Background**

Gilliam, age 41 at the time of her hearing before the administrative law judge (ALJ), suffers from a number of medical problems, including Meniere's disease, sensorineural hearing loss, tinnitus, vertigo, panic attacks, confusion, depression, anxiety, hypertension, bulging discs, obesity, Chiari malformation and frequent headaches. Meniere's disease is a "disorder of the inner ear that causes severe dizziness (vertigo), ringing in the ears (tinnitus), hearing loss, and a feeling of fullness or congestion in the ear." National Institutes of Health, National Institute on Deafness and Other Communication Disorders, https://www.nidcd.nih.gov/health/balance/pages/meniere.aspx. Chiari malformation is a structural defect in the cerebellum, the part of the brain that controls balance. National Institute of Neurological Disorders and Stroke, http://www.ninds.nih.gov/disorders/chiari/detail_chiari.htm.

Gillim completed high school and has experience as a police dispatcher. (R. 31, 50). Gillim applied for DIB on June 2, 2008, alleging she became totally disabled on December 1, 2007 because of Meniere's disease, fluctuating sensorineural hearing loss, tinnitus, aural fullness, vertigo, panic attacks, confusion, difficulty concentrating, depression, difficulty with balance, hyperacusis, Chiari malformation and frequent headaches. (R. 104, 135). Gillim's application was denied at the initial and reconsideration levels. (R. 56-60, 62-65). At the time of the March 18, 2010 hearing, Gillim lived in Vermont. (R. 33). Gillim testified that she suffers one or two vertigo/dizziness episodes a week from her Meniere's disease which cause her to be debilitated for several hours each. (R. 37).

Under the required five-step analysis used to evaluate disability, ALJ Janice M. Bruning found that Gillim had not engaged in substantial gainful activity since her alleged onset date of December 1, 2007 (step one); her Meniere's disease and Chiari malformation were severe impairments (step two); but that they did not qualify as a listed impairment (step three). (R. 16, 17). The ALJ determined that Gillim retained the residual functional capacity (RFC) to perform sedentary work except no work around heights or moving machinery, only occasionally climbing ladders, ropes, scaffolds, ramps, and stairs, balancing, stooping, crouching, kneeling, or crawling, no contact with the general public, occasional contact with coworkers and supervisors, and no environments with background noise. (R. 17). Given this RFC, the ALJ concluded that Gillim was unable to perform her past relevant work as a police dispatcher (step four). (R. 22). The ALJ found there were jobs that exist in significant numbers in the economy that Gillim could perform considering her age, education, and residual functional capacity, including order clerk or information clerk (step five). (R. 22-23). The Appeals Council denied Gillim's request for review on August 22, 2011. (R. 1-4). Gillim now seeks judicial review of the final decision of the Commissioner, which is the ALJ's ruling. O'Connor-Spinner v. Astrue, 627 F.3d 614, 618 (7th Cir. 2010).

**II.     Discussion**

Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).  In order to determine whether a claimant is disabled within the meaning of the Act, the ALJ conducts a five-step sequential inquiry:  (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, see 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform his former occupation; and (5) whether the claimant is unable to perform any other available work in light of his age, education, and work experience.  20 C.F.R. § 404.1520(a) (2004); Clifford v. Apfel, 227 F.3d 863, 868 (7th Cir. 2000).  "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled."  Clifford, 227 F.3d at 868 (quoting Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence, based upon a legal error, or too poorly articulated to permit meaningful review.  Hopgood ex rel. v. L.G. v. Astrue, 578 F.3d 696, 698 (7th Cir. 2009). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).  In its substantial evidence review, the court critically reviews the entire administrative record but does not reweigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its own

judgment for that of the Commissioner. Clifford, 227 F.3d at 869. An ALJ's credibility determination is generally entitled to deference and will not be overturned unless it is patently wrong. Schaaf v. Astrue, 602 F.3d 869, 875 (7th Cir. 2010).

In this case, the ALJ denied Gillim's claim at step five, finding that Gillim retains the RFC to perform a range of sedentary work. Gillim challenges four main aspects of the ALJ's decision: (1) the ALJ erred in evaluating her mental limitations at steps two and three; (2) the ALJ erred in assessing Gillim's residual functional capacity; (3) the ALJ's adverse credibility determination is patently wrong; and (4) the ALJ erred at step five by failing to account for all of Gillim's limitations in the hypothetical given to the vocational expert (VE). Because the ALJ did not adequately consider Gillim's mental limitations, the ALJ's decision is not supported by substantial evidence and a remand is required

**A.     Mental Limitations**

    **1.     Special Technique**

Gillim first argues that the ALJ failed to follow the special technique procedure for evaluating her mental limitations. The special technique is "used to analyze whether a claimant has a medically determinable mental impairment and whether that impairment causes functional limitations." Craft v. Astrue, 539 F.3d 668, 674 (7th Cir. 2008). The special technique applies at steps two and three of the five-step analysis. Id. Under the special technique, the ALJ evaluates the claimant's "pertinent symptoms, signs, and laboratory findings" to determine whether the claimant has a medically determinable mental impairment. Id. If the claimant has a medically determinable mental impairment, the ALJ must document that finding and rate the degree of functional limitation in four broad areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Id. These areas are known as the "B criteria." Id.

The first three functional areas are rated on a five-point scale of none, mild, moderate, marked, and extreme. Craft, 539 F.3d at 674-75. The fourth functional area–episodes of decompensation–is rated on a four-point scale of none, one or two, three, and four or more. Id. at 675. "If the ALJ rates the first three functional areas as none or mild and the fourth area as none, then generally the impairment is not considered severe." Id. "Otherwise, the impairment is considered severe, and the ALJ must determine whether it meets or is equivalent in severity to a listed mental disorder." Id. If the impairment neither meets nor is equivalent in severity to any listing, then the ALJ will assess the claimant's RFC. Id. The ALJ's decision must adequately discuss the significant medical history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the mental impairment's severity. Id. The decision must include "a specific finding as to the degree of limitation in each of the functional areas." Id.

The ALJ found that Gillim's mood disorder condition is not a severe impairment. (R. 16-17). At steps two and three, the ALJ did not apply the special technique to determine the severity of Gillim's mental impairments. The Commissioner essentially argues that the ALJ's error in failing to apply the special technique at steps two and three was harmless because the ALJ applied the special technique during her RFC analysis. The ALJ did consider three of the four B criteria in her RFC analysis. The ALJ concluded that Gillim had "only mild restriction in her activities of daily living, social functioning, and concentration, persistence, and pace." (R. 21). The ALJ made no specific finding as to episodes of decompensation. In her RFC discussion, the ALJ accorded "little weight" to the opinion of Dr. Constance A. Fullilove, Ph.D., the state agency reviewing psychologist, who diagnosed Gillim as having a mood disorder with anxiety and depression. (R. 333). Dr. Fullilove found Gillim to be moderately limited in two of the B Criteria (activities of daily living and concentration, persistence, or pace), as well as moderately limited in the ability to maintain attention and concentration for extended periods, the ability to perform activities within a schedule,

maintain regular attendance, and to be punctual within customary tolerances, and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 340, 352-53). Dr. Fullilove concluded:

> The claimant is capable of performing SRT (simple repetitive tasks) on a sustained basis. She would not be successful in meeting strict production standards, due to her slow pace, but would otherwise be successful in a competitive setting. In spite of limitations associated with her severe impairment, she retains the mental capacity to do simple tasks.

(R. 354). The ALJ gave "little weight" to Dr. Fullilove's opinion because she was "unaware of the claimant's activities including driving from Vermont to Illinois alone, geocaching, training her cat to bring her medications, taking pictures, and using her computer regularly." (R. 21). The ALJ's RFC finding incorporates no limitations based on Gillim's mental health condition.

"Under some circumstances, the failure to explicitly use the special technique may indeed be harmless error." Craft, 539 F.3d at 675. In Craft, the ALJ did not apply the special technique to determine the severity of Craft's mental impairments. Id. The ALJ determined at step two that Craft's dysthymia was severe without discussing Craft's mental medical history or rating the severity of the four functional areas of limitation. Id. Although the ALJ did recite some of Craft's mental medical history in the RFC analysis, the Seventh Circuit stated that "the RFC analysis is not a substitute for the special technique, even though some of the evidence considered may overlap." Id; see also SSR 96-8p (stating "[t]he adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process."). The government argued in Craft that the ALJ's failure to apply the special technique was harmless because the ALJ determined that Craft had a severe mental impairment and considered whether it met or equaled a listed impairment. Id. The Seventh Circuit concluded that the ALJ's error was not harmless "because the ALJ's failure to consider the functional impairments during the special

technique analysis was compounded by a failure of analysis during the mental RFC determination." Id.

In a later decision, the Seventh Circuit again rejected the government's argument that the ALJ's failure to follow the special technique was harmless because the ALJ rated the claimant in each of the four functional categories at step three of the five-step analysis. Richards v. Astrue, 370 Fed. Appx. 727, 730 (7th Cir. 2010). The Seventh Circuit found that the ALJ's failure to explicitly use the special technique was "compounded by other errors in her analysis, and the combined effect of these errors require[d] a remand." Id. The Richards court was most significantly "troubled that the ALJ rated Richard's mental functional limitations without the benefit of any medical professional's assessment of her mental RFC." Id. Typically, when an applicant claims a mental impairment, an agency consultant will complete a psychiatric review technique form before the case reaches the ALJ. The court explained that Richards's case was unusual because "her initial application claimed only an eye impairment, and thus the state-agency physicians who reviewed her file evaluated only the effect of her visual limitations on her ability to work." Id. at 731. "Yet, without any medial professional having rated Richards's limitations in the areas of daily living, social functioning, and concentration, persistence, and pace, the ALJ assigned a rating of 'mild' in each category." Id. In the absence of any "expert foundation" for these ratings, the Seventh Circuit could not "discern the necessary logical bridge from the evidence to the ALJ's conclusions." Id.

The ALJ's failure to apply the special technique at steps two and three was not harmless. In this case, as in Richards, the ALJ's ratings for the B criteria were made without "expert foundation." It is unclear what supporting medical evidence the ALJ relied upon in reaching her conclusion that Gillim's mood disorder condition is "non-severe." (R. 17). The ALJ did not identify medical evidence from other treating, examining, or reviewing physicians that supported her decision to set aside the opinion of Dr. Fullilove. In fact, there is no alternative expert evidence to

support the ALJ's disregard of Dr. Fullilove's opinion that Gillim has a moderate restriction of activities of daily living and moderate difficulties in maintaining concentration, persistence, or pace. (R. 340). Dr. Fullilove provided the only mental RFC in the record. Therefore, it can only be assumed that the ALJ improperly relied on her own unsupported judgment to determined the mental RFC. By finding that Gillim was only mildly restricted in her activities of daily living and in her concentration, persistence, and pace, the relied solely on her own interpretation of the medical evidence and made conclusions that had no expert support in the record. As a result, the necessary logical bridge from the evidence to the ALJ's B criteria ratings is missing and a remand is necessary.

### 2. Step Two

Like the ALJs in Craft and Richards, the ALJ's error here is compounded by other errors in her analysis of Gillim's mental impairments. In determining that Gillim does not have a severe mental impairment at step two of the sequential analysis, the ALJ noted that Gillim "has not received any counseling nor has she had any emergency room visits for this condition. Her only treatment regarding this condition has been medication." Id. There is a problem with the lack of counseling reason given by the ALJ at step two. An "individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints . . . ." SSR 96-7p. But an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record that may explain infrequent or irregular medical visits or failure to seek medical treatment." Id; Craft, 539 F.3d at 679 (emphasizing that "the ALJ 'must not draw any inferences' about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care."). An ALJ may need to "question the individual at the administrative proceeding in order to

determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner." SSR 96-7p. Inability to afford treatment and inability to access free or low-cost medical services "may provide insight into the individual's credibility." SSR 96-7p.

The ALJ found that Gillim's mental impairment was not severe based in part on the fact that she had not received any counseling. (R. 24). The record shows that Gillim's ability to access mental health counseling was limited by her lack of health insurance. On September 20, 2007, Dr. Solis reported that Gillim "has tried to seek counseling but [it] is unaffordable." (R. 306); see also (R. 308) (4/30/2008 note references no insurance); (R. 371) (2/10/09 note references no insurance). At the administrative hearing in March 2010, Gillim testified that she had been referred to a mental health practitioner but lacked health insurance and could not afford it. (R. 48). Gillim's inability to afford treatment is a reasonable explanation for her lack of mental health counseling. In her decision, the ALJ failed to consider Gillim's explanation that her failure to seek treatment from a mental health specialist stemmed from her lack of health insurance and inability to afford care. Without doing so, the ALJ was not entitled to infer from Gillim's failure to seek counseling that her mental impairments were non-severe at step two. Consequently, the ALJ should not have rested her finding that Gillim does not suffer from a severe mental impairment on Gillim's failure to seek mental health counseling.

At step two, the other reason given by the ALJ for finding that Gillim does not suffer from a severe mental impairment is that Gillim did not have any emergency room visits for a mental condition. (R. 16). The ALJ's characterization of the record in this regard does not appear to be accurate. On February 13, 2009, Gillim sought care at Kishwaukee Community Hospital in Dekalb, Illinois for what she describes as a "depressive episode." (R. 206, 376-77). The emergency room physician prescribed Lorazepam (Ativan), which is used to treat anxiety, and antivert (Meclizine), which is used to treat vertigo. (R. 377). The record contains only laboratory test results and a bill

for $2,218.65 from Kishwaukee Community Hospital for February 13, 2009 but no other records of the emergency room visit. (R. 376-77). Prior counsel for Gillim apparently requested additional records from Kishwaukee Community Hospital regarding her treatment but those documents were never included in the record. (R. 218, 221). Additionally, although not hospitalized, in September 2009, Gillim had to call an ambulance for a vertigo episode along with a panic attack. (R. 38-865). After being treated with oxygen and taking Meclizine, Gillim felt better and declined to be transported to a hospital. Id.

In any event, a lack of psychiatric emergency room visits is not a sufficient reason for rejecting a severe mental impairment at step two. An impairment is not severe if the medical evidence establishes only "a slight abnormality (or a combination of slight abnormalities) that have no more than a minimal effect on an individual's ability to do basic work activities." SSRs 96-3p; 85-28. The burden on the claimant at step two is "de minimis." Johnson v. Sullivan, 922 F.2d 346, 347 (7th Cir. 1990). A lack of psychiatric hospitalizations is not necessarily inconsistent with a severe mental impairment. French v. Astrue, 2010 WL 2803965, at *6 (C.D. Cal. July 15, 2010) (stating "[a] claimant may suffer from a severe mental impairment without having been hospitalized for that limitation."). "Although evidence of episodes of decompensation or psychiatric hospitalizations likely would suffice to establish a severe mental impairment, such evidence is unnecessary to pass the 'de minimis' severity threshold." Efrem v. Colvin, 2013 WL 990674, at *4 (C.D. Cal. March 11, 2013); see also Estrada v. Astrue, 2012 WL 6553768, at *2 (C.D. Cal. Dec. 14, 2012) (stating "the lack of evidence of psychiatric hospitalization or comparably serious treatment is not dispositive because step two is only 'a de minimis screening device to dispose of groundless claims.'"). At step two, it was error for the ALJ to insist on a psychiatric episode requiring Gillim's hospitalization in order to demonstrate that she suffers from a severe mental impairment. Adkins v. Astrue, 2010 WL 3782388, at *9 (N.D. Ind. Sept. 21, 2010) (stating "[b]ecause there is no evidence in the record that severe mental impairments necessarily (or even

generally) result in hospitalization, and that conclusion seems untenable, this Court concurs with [plaintiff] that his lack of hospitalization was not a proper basis for discrediting his testimony regarding his symptoms" at step two). As a result, the second reason given by the ALJ for finding that Gillim does not suffer from a severe mental impairment is flawed.

The ALJ also supports her determination that Gillim does not suffer from a severe mental impairment with the conclusion that "there are no documented work-related limitations" caused by her mood disorders. (R. 17). The ALJ's conclusion that there is no documented evidence of work-related limitations caused by Gillim's mental impairment is not supported by the record. Dr. Fullilove found that Gillim's mood disorder with anxiety and depression results in specific work related limitations in concentration, persistence, or pace. Due to Gillim's moderate restrictions in concentration, persistence, or pace, Dr. Fullilove found work-related limitations of simple, repetitive tasks and no strict production standards. (R. 340, 354). With no other reasons to support the ALJ's finding that Gillim did not suffer from a severe mental impairment, the ALJ's step two decision in this regard is not supported by substantial evidence. Although these errors in evaluating whether Gillim suffers from a severe mental impairment may be harmless because the ALJ found other severe impairments and continued with the five-step evaluation process, this case requires a remand for other reasons. Accordingly, upon remand, the ALJ shall specifically reconsider whether Gillim has shown that she suffers from a severe mental impairment.

Moreover, there is evidence in Gillim's medical history indicating that she suffers from a severe mental impairment. While Gillim testified that she cannot afford to seek a mental health counseling due to lack of insurance, she has sought treatment for her mental health condition through her primary care physicians. Gillim has been prescribed psychotropic medications (Lorazepam for panic attacks and paroxetine (Paxil) to treat her depression and anxiety), which she obtains through her primary care doctors. (R. 48, 196, 207, 215, 308 , 320, 322, 326, 370, 386, 387); see Khaleck v. Astrue, 2010 WL 3943546, at *5 (E.D. Cal. Oct. 7, 2010) (stating "[a]lthough

-11-

the ALJ also discounted plaintiff's mental health treatment on the ground that she received psychotropic medications through her primary care provider rather than from a mental health specialist, courts have recognized that most psychiatric impairments are diagnosed and treated by primary care physicians, and there is no statutory or regulatory requirement that such treatment be provided by a psychiatrist or psychologist."). Also, on August 21, 2008, Barbara F. Sherman, Psy.D., a licensed clinical psychologist, examined Gillim. (R. 319-23). Dr. Sherman observed that Gillim was "observably dysphoric." (R. 321). Gillim described herself as tearful, crying a few times a week. Id. Dr. Sherman noted that Gillim "described pervasive signs of clinical depression but not suicidal ideation" and "episodes of anxiety, which are debilitating." (R. 321, 323). Dr. Sherman diagnosed Gillim with mood disorder due to medical condition with anxiety and depression. Id. at 322. The ALJ's decision makes no mention of Dr. Sherman's report.

### 3. RFC Determination

There are other problems with the ALJ's evaluation of Gillim's mental impairments which impacted her evaluation of Gillim's mental RFC. The entirety of the ALJ's RFC discussion of Gillim's mental impairments is as follows:

> I accord little weight to this opinion [by Dr. Fullilove] because [she was] unaware of the claimant's activities including driving from Vermont to Illinois alone, geocaching, training her cat to bring her medications, taking pictures, and using her computer regularly. Additionally, the claimant testified that she lived alone before December 2009 and performed her activities of daily living, albeit, at her own pace. The claimant also described socializing on the phone and via the computer, shopping with friends, and attending church. Given the extent of these activities, I find that the claimant has only mild restriction in her activities of daily living, social functioning, and concentration, persistence, and pace.

(R. 21). The ALJ's reasons for discounting Dr. Fullilove's opinion do not withstand scrutiny because the ALJ did not fairly characterize the facts regarding Gillim's activities and did not properly explain the rationale for her finding.

In describing Gillim's activities and according little weight to Dr. Fullilove's opinion, the ALJ picked and chose the parts of the record favorable to her decisions and ignored Gillim's testimony from the hearing in March 2010 that her daily activities had become much more limited over time. The ALJ's decision mentioned that Gillim used "her computer regularly" and socialized "via the computer" while disregarding Gillim's testimony that she "can't spend a lot of time on the computer." (R. 21, 44). Gillim said she can usually spend only a "few minutes" communicating with family on the computer. (R. 45-46). Gillim added that "most of her social groups were online communications. And I don't do those anymore." (R. 45). While the ALJ was correct in noting that Gillim attends church, she overlooked Gillim's testimony that she attends church "maybe once a month." (R. 21, 45). Similarly, while Gillim did state that she likes to geocache, her ability to engage in that activity has "been greatly diminished." (R. 44).[1] Gillim explained at the hearing that geocaching is a "very online socially oriented" activity that she "can't really do anymore because [she] can't spend a lot of time on the computer." Id. The ALJ noted also that Gillim described "shopping with friends." (R. 21). However, when asked at the hearing if she goes to the grocery store or does any shopping, Gillim testified, "I used to." (R. 41). Gillim indicated that stores are a "very over stimulating environment" and "more often than not" her housemate does the shopping. Id.[2] Because the ALJ's conclusion that Gillim's activities are inconsistent with Dr. Fullilove's opinions is based upon a selective and misleading discussion of the record, it does not appear that Gillim's testimony regarding her more limited activities was considered or weighed in the ALJ's analysis. Godbey v. Apfel, 238 F.3d 803, 808 (7th Cir. 2000) (holding that an ALJ may not

---

[1] Geocaching is a "free real-world outdoor treasure hunt" where "[p]layers try to locate hidden containers, called geocaches, using a smartphone or GPS and can then share their experiences online." See Geocaching, http://www.geocaching.com/

[2] Elsewhere in the decision, the ALJ acknowledged that Gillim "said that she finds stores to be an overstimulating environment for her and she avoids going shopping." (R. 19). The ALJ summarized some of Gillim's hearing testimony regarding her daily activities (R. 19) but not in the context of her assessment of Dr. Fullilove's opinion.

selectively discuss evidence); Binion v. Chater, 108 F.3d 780, 788 (7th Cir. 1997) (stating "[a]n ALJ must consider all relevant evidence and may not select and discuss only that evidence that favors his ultimate conclusion.").

Second, the ALJ did not adequately explain how her summary of Gillim's activities was inconsistent with Dr. Fullilove's opinion that Gillim had moderate limitations in her activities of daily living and concentration, persistence, or pace. After listing Gillim's activities, the ALJ simply concluded: "Given the extent of these activities, I find that the claimant has only mild restriction in her activities of daily living, social functioning, and concentration, persistence, and pace." (R. 21). The ALJ gave no explanation supporting her bare conclusion regarding the significance of these activities by Gillim to Dr. Fullilove's findings. As to the first items of evidence, the ALJ did not explain how Gilliam's ability to drive from Vermont to Illinois to attend the administrative hearing (with frequent stops and taking about a week), geocaching, training her cat, taking pictures, and her limited computer use means that she is not moderately restricted in her activities of daily living and moderately limited in maintaining concentration, persistence or pace. The ALJ should have stated why the activities she listed undermined Dr. Fullilove's conclusions. Simply mentioning the activities as the ALJ did is insufficient to build a "logical bridge" between the evidence and her conclusions. Next, the ALJ stated that Gilliam "testified that she lived alone before December 2009 and performed her activities of daily living, albeit, at her own pace." (R. 21). Again, the ALJ did not explain how living alone and performing activities of daily living at her own pace is inconsistent with Dr. Fullilove's conclusions. In fact, the ability to do daily activities at her own pace supports Dr. Fullilove's conclusion that Gillim has moderate difficulties in maintaining concentration, persistence, or pace and "would not be successful in meeting strict production standards, due to her slow pace." (R. 340, 354). Finally, the ALJ did not explain how the ability to communicate online for a few minutes at a time and attend church once a month is inconsistent with the finding of Dr. Fullilove that Gillim had moderate restrictions in daily activities and moderate difficulties in

maintaining concentration, persistence or pace. On remand, the ALJ shall expressly explain why Gillim's activities of daily living mean that she is not moderately limited in her activities of daily living and concentration, persistence, or pace.

**B.      Listing 12.04**

Gillim next challenges the ALJ's failure to analyze Listing 12.04 at step three. Gillim offers only a one-sentence argument as to Listing 12.04 in her opening memorandum: "[t]here was no mention of Listing 12.04, Affective Disorders, which would have emerged from the use of the special technique." (Doc. 34 at 7). Gillim does not specify how her mental impairments meet or medically equal the criteria of Listing 12.04. The Commissioner acknowledges that the ALJ did not explicitly discuss Gillim's mood disorder at step three, but argues such error was harmless because Gillim can not satisfy Listing 12.04.

"In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004). A claimant "must satisfy all of the criteria in the Listing in order to receive an award of disability insurance benefits . . . under step three." Rice v. Barnhart, 384 F.3d 363, 369 (7th Cir. 2004). An ALJ's failure to specifically mention a listed impairment is not alone a basis for reversal where the decision otherwise sufficiently discusses its potential application. Id. at 369-70.

An affective disorder consists of "a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. Pt. 404, subpt. P, App. 1, § 12.04. To establish an affective disorder under Listing 12.04, a claimant must meet both the "A" and "B" criteria identified in the listing or the "C" criteria. Under the B criteria of Listing 12.04, at least two of the following must be present: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or

pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, subpt. P, App. 1, § 12.04 (B). The C criteria requires a "documented history of a chronic affective disorder of at least 2 years' duration." 20 C.F.R. Pt. 404, subpt. P, App. 1, § 12.04 (C).

Although the ALJ did mention Listings 2.00 (special senses and speech) and 11.00 (neurological), she did not cite Listing 12.04 in her decision. The ALJ did, however, discuss three of the four B criteria in her RFC analysis. (R. 21). As to the fourth B criteria, the ALJ did not discuss episodes of decompensation but there is no evidence of any episodes of decompensation in the record. (R. 340). Gillim has failed to demonstrate that she meets or equals the requirements of Listing 12.04 even considering Dr. Fullilove's opinion, which the ALJ disregarded. Rice, 384 F.3d at 369 (explaining that the claimant must establish that the medical evidence of record sufficiently demonstrates that she meets or equals a listing). Even if Dr. Fullilove's opinion were fully credited, it does not support a finding that Gillim meets the B criteria of Listing 12.04. Dr. Fullilove concluded that Gillim's mood disorder caused moderate restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. (R. 340). No physician other than Dr. Fullilove provided an assessment with regard to the B criteria of Listing 12.04. Gillim does not claim that her medical history meets the C criteria of Listing 12.04. The ALJ's failure to specifically consider Listing 12.04 at step three of the analysis was therefore harmless error. However, given the remand of this case, the Commissioner is encouraged to take the opportunity on remand to properly conduct the Listing 12.04 analysis.

**C.    Listing 2.07**

Gillim also argues that the ALJ erred by failing to compare her impairments to Listing 2.07. Listing 2.07, which covers disturbance of labyrinthine-vestibular function including Meniere's disease, requires "a history of frequent attacks of balance disturbance, tinnitus, and progressive

hearing loss" and disturbed function of vestibular labyrinth, demonstrated by caloric or other vestibular tests, and hearing loss established by audiometry. 20 C.F.R. Pt. 404, subpt. P, App. 1, § 2.07. Here, the ALJ did not expressly cite to Listing 2.07. Rather, the ALJ considered Gillim's Meniere's disease and hearing loss under Listing 2.00 (special sense and speech). The ALJ found that Listing 2.00 was not met because Gillim "demonstrated an ability to hear and communicate well at the hearing and she is able to drive." (R. 17).

Because remand is necessary to reevaluate Gillim's mental limitations, the Court declines to address the merits of Gillim's Listing 2.07 contention. However, the Court notes that it is the Commissioner's position that Gillim meets all of the requirements of Listing 2.07 except progressive loss of hearing. The Commissioner argues that the medical records document "fluctuating" hearing loss but fail to support "progressive" hearing loss. In her RFC discussion, the ALJ did point out that a November 13, 2008 Audiological Report described Gillim's hearing loss as "fluctuating" and "mild." (R. 21, 358-59). Gillim will have the opportunity on remand to demonstrate that her impairments meet the requirement of "progressive hearing loss." Upon remand, the ALJ shall engage in an analysis of whether Gillim's impairments meet Listing 2.07 at step three of the sequential evaluation process. The ALJ shall explain her conclusion as to Listing 2.07 and cite to any medical records to support it.

**D.    Remaining Issues**

The remainder of Gillim's arguments relate to the ALJ's RFC determination, credibility analysis, and hypothetical to the VE. Because the ALJ erred in evaluating the Gillim's mental impairments under the B criteria and rejecting Dr. Fullilove's uncontradicted opinion, the Court declines to reach the remainder of Gillim's arguments. The reevaluation of Gillim's mental impairments on remand will necessarily require a reassessment of Gillim's RFC and a reevaluation of Gillim's credibility. Gillim may raise her arguments regarding any alleged remaining errors on

remand.

## III. Conclusion

For these reasons, Plaintiff's Motion to Reverse the Final Decision of the Commissioner of Social Security [30] is granted, and the Commissioner's Motion for Summary Judgment [42] is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion. The Clerk is directed to enter judgment in favor of Plaintiff Tara Lee Gillim and against Defendant Acting Commissioner of Social Security.

**E N T E R:**

*Daniel G. Martin*

**Daniel G. Martin**
**United States Magistrate Judge**

**Dated: May 7, 2013**